IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, THE NATIONAL BASKETBALL ASSOCIATION, a joint venture, THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, THE NATIONAL FOOTBALL LEAGUE, an unincorporated association, and THE NATIONAL HOCKEY LEAGUE, an unincorporated association, <br><br> Plaintiffs, <br><br> v. <br><br> JACK A. MARKELL, Governor of the State of Delaware, and WAYNE LEMONS, Director of the Delaware State Lottery Office, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 09-538 |

## VERIFIED COMPLAINT

Plaintiffs The Office of the Commissioner of Baseball doing business as Major League Baseball ("MLB"), the National Basketball Association (the "NBA"), the National Collegiate Athletic Association (the "NCAA"), the National Football League (the "NFL") and the National Hockey League (the "NHL"), by and through their undersigned counsel, upon knowledge as to themselves and upon information and belief as to all other matters, allege for their complaint as follows:

### Nature of the Action

1. This is an action challenging Delaware's plan, through recent legislation and regulations, to implement and conduct a sports betting scheme that impermissibly expands

Delaware's existing State Lottery Act, 29 *Del. C.* § 4801 *et seq.*, by allowing head-to-head and single-game betting within the State of Delaware on all professional and amateur sports ("Delaware's Sports Betting Scheme" or the "Scheme"). The legislation authorizing this Scheme, which purports to authorize the Delaware State Lottery Office (the "Lottery Office") to institute and operate a so-called "sports lottery" within the State, was enacted despite considerable uncertainty over its legality. Indeed, Governor Markell himself requested an opinion from the Justices of the Delaware Supreme Court addressing the constitutionality of sports betting under the Delaware Constitution and is proceeding with the implementation of the Scheme in spite of the Justices' refusal to render an opinion on the constitutionality of single-game betting. The State has publicly announced its intention to have the sports lottery operational by the time the 2009-2010 NFL regular season kicks off on September 10, 2009.

2. On June 30, 2009, the Lottery Office promulgated proposed regulations to permit, *inter alia,* betting on the outcome of particular athletic contests, betting on the total points scored in particular athletic contests, and "parlay" betting in which the bettor must correctly pick the outcomes or total points scored in multiple athletic contests. Notably, the proposed regulations contemplate betting on any professional or collegiate sporting event (other than sporting events involving Delaware schools or teams), including racing. As described below, only parlay betting (as opposed to single-game betting) on professional football, involving a minimum of three football games, was conducted under Delaware's 1976 sports betting scheme.

3. As alleged in more detail herein, Delaware's Sports Betting Scheme, as contemplated by Delaware's new statute (the "Sports Lottery Act" or the "Act") and the regulations recently proposed by the Lottery Office, violates the Professional and Amateur

Sports Protection Act ("PASPA") and the Delaware Constitution. PASPA imposes a broad ban on sports gambling, subject to a narrow exception for a limited number of states to permit sports betting "to the extent" that state "conducted" such activities between 1976 and 1990. *See* 28 U.S.C. § 3701 *et seq.* The Delaware Constitution goes even farther – declaring that *all* forms of gambling are prohibited in Delaware, subject to four narrow exceptions. *See* Del. Const. art. II, §17.

4. Indeed, in their May 27, 2009 Opinion addressing the constitutionality of a sports lottery under the Delaware Constitution (the "May 27 Opinion"), the Justices of the Delaware Supreme Court concluded that, while the Delaware Constitution generally authorized "games of pure chance" as well as "games in which chance is the dominant determining factor," the constitutionality of single-game betting was a topic on which they could not opine. *In re: Request of the Governor for an Advisory Op.*, __ A.2d __, 2009 WL 1475736, at *7, 8 (Del. May 29, 2009). Governor Markell has recently confirmed that, notwithstanding the Justices' May 27 Opinion, the sports lottery planned for the fall of 2009 will include games involving head-to-head or single-game betting.

5. Sports lotteries involving single-game betting threaten the integrity of professional and amateur sports and are fundamentally at odds with the principle – essential to the success of MLB, the NBA, the NCAA, the NFL, and the NHL – that the outcomes of professional and collegiate athletic contests must be perceived by the public as being determined solely on the bases of honest athletic competition. Sports leagues have consistently opposed legalized sports gambling in other states and at the federal level because sports betting undermines the public's faith and confidence in the character of professional and amateur team sports.

6. Professional and amateur sports are an integral part of American culture, particularly among the country's youth who often look up to professional athletes as role models and heroes. The implementation of a comprehensive sports betting scheme in Delaware would irreparably harm professional and amateur sports by fostering suspicion and skepticism that individual plays and final scores of games may have been influenced by factors other than honest athletic competition. As Congress recognized when it enacted PASPA, the proliferation of sports betting, including the introduction of individual game sports betting in Delaware, threatens to harm the reputation and goodwill of MLB, the NBA, the NCAA, the NFL and the NHL, and to adversely affect the way the public views professional and amateur sports. This is a harm that cannot even begin to be measured, let alone compensated by money damages.

## **The Parties**

7. Plaintiff MLB is an unincorporated association whose members are the thirty Major League Baseball Clubs. The Office of the Commissioner of Baseball, on behalf of its members, has responsibility for administrative and operational matters relating to Major League Baseball. MLB headquarters are located at 245 Park Avenue, New York, New York 10167.

8. Plaintiff the NBA is a joint venture of thirty member teams that is organized under the laws of New York, with its principal place of business located at 645 Fifth Avenue, New York, New York 10022. The NBA engages in the production and marketing of NBA basketball and operates a professional basketball league in the United States and Canada.

9. Plaintiff the NCAA is an unincorporated association, composed of nearly 1,300 institutions, conferences, organizations and individuals. The NCAA organizes and governs the athletic programs of colleges and universities throughout the United States. The NCAA's headquarters are located at 700 West Washington Street, Indianapolis, Indiana 46202.

10. Plaintiff the NFL is an unincorporated 501(c)(6) association controlled by its thirty-two constituent member clubs. The NFL is the largest professional football league in the United States. Originally formed in 1920 as the American Professional Football Conference, the league has been operating under the NFL moniker since 1922. The NFL's headquarters are located at 280 Park Avenue, New York, New York 10017.

11. Plaintiff the NHL is an unincorporated 501(c)(6) association, composed of thirty Member Clubs. NHL teams are located in a diverse group of cities throughout the United States and Canada. The NHL League Office headquarters are located at 1185 Avenue of the Americas, New York, New York 10036.

12. Defendant Jack A. Markell is the current Governor of the State of Delaware. Elected to office in November 2008, Governor Markell was sworn in on January 20, 2009.

13. Defendant Wayne Lemons ("Director Lemons") is the current Director of the Lottery Office, an agency created by 29 *Del. C.* § 4802, that operates as a division of the Department of Finance. The Director of the Lottery Office is appointed by the Delaware Secretary of Finance with the written approval of the Governor. Director Lemons has primary responsibility for administering Delaware's existing video lottery and traditional lottery. Under the Sports Lottery Act, the Director is vested with broad authority to craft, implement and commence a sports lottery within the State, and to promulgate rules and regulations relating to its establishment and operation.

**Jurisdiction and Venue**

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367(a).

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).

## The Delaware Constitution's Ban on Gambling and the Delaware State Lottery Act

16. The Delaware Constitution, as adopted in 1897, banned gambling in any form. Over the years, the Constitution of 1897 has been amended several times, including in 1973, when Article II, Section 17 was re-written to permit state-run lotteries:

> All forms of gambling are prohibited in this State except the following: (a) Lotteries under State control for purposes of raising funds, . . .

Del. Const. art. II, § 17.[1] Initially, this exception (the "Lottery Exception") was used to establish the Delaware Lottery, in which tickets were sold for games with weekly drawings. In December 1995, the "Lottery Exception" was expanded to permit a State-run "video lottery" (*i.e.*, slot machines) at the State's three existing racetracks. Delaware's Sports Betting Scheme purports to further stretch the Lottery Exception beyond all lawful limits by permitting all forms of sports betting (except betting on Delaware collegiate or professional teams) in the State.

17. In conjunction with the establishment of the Delaware Lottery in 1974, the Delaware General Assembly enacted 29 *Del. C.* § 4801 *et seq.* (the "Delaware Lottery Act"). The Delaware Lottery Act has been amended several times, most recently to include the provisions of the Sports Lottery Act that are part of Delaware's Sports Betting Scheme challenged in this action.

## Delaware's Ill-Fated Attempt at Sports Betting in the 1970s

18. In September 1976, Delaware introduced two weekly "lottery" games in which the winners were determined by the results of NFL football games; a third game was introduced mid-season as a replacement for one of the original games (collectively, the "1976

---

[1] The remaining three exceptions to Article II, Section 17 are not implicated in Delaware's Sports Betting Scheme.

Games"). No legislation was enacted to expand or modify the existing Delaware Lottery Act to authorize these games. Rather, the 1976 Games were based solely on the purported authority provided by an opinion letter issued by the Delaware Attorney General's Office on May 19, 1976, despite the requirement set forth in Article II, Section 17 of the Delaware Constitution requiring the Delaware General Assembly to "enforce this Section by appropriate legislation." Del. Const. art. II, § 17.

19. The 1976 Games, all of which were parlays that were based on the results of multiple NFL games, were collectively known as "Scoreboard." In the first game, called "Football Bonus," the fourteen NFL games then played each week were divided into two seven-game pools. Players were asked to project the winners of each of the seven games in one or both of the two pools, and were permitted to place bets ranging from $1 to $10. To win the game, players were required to predict correctly the winners in all seven games in a pool. If a player correctly selected the winners in both pools, *i.e.*, all fourteen games, he or she was entitled to an "All Game Bonus." Prizes were awarded on a pool or pari-mutuel basis, such that payouts varied depending on the total amount bet by all players.

20. The second game was called "Touchdown." For each given week, players were asked to choose not only the winners of multiple NFL games, but also to correctly select, for each game, one of three ranges of possible point spreads. To win, players were required to correctly select the winning team and the winning point spread range in each of three, four or five contests. Like Football Bonus, awards were paid on a pari-mutuel basis.

21. The third game, "Touchdown II," replaced "Touchdown" mid-season. In Touchdown II, players were asked to consider a published point spread for each of twelve games and select a team to "beat" the point spread, *i.e.*, perform better than the point spread. To win

Touchdown II, players had to correctly choose the team that beat the published point spread in a minimum of four and a maximum of twelve NFL games. Touchdown II offered a fixed payout based upon the number of games on which players bet.

22. In December 1976 – before the end of Scoreboard's inaugural NFL season – Touchdown II caused the Delaware sports lottery to collapse when the Lottery Office offered a "bad line" for the December 12 games. Players recognized the Lottery Office's mistake and wagered heavily to take advantage of the bad line. The State sustained massive losses, forcing it to draw on its emergency fund to pay the winning bettors, and Delaware's brief foray into sports betting was abandoned.

### The NFL Challenges the Constitutionality of the Scoreboard Games and the Delaware Supreme Court Justices Express A View on the Lottery Exception

23. Contemporaneous with the implementation of the Scoreboard games in Delaware in 1976, the NFL filed suit in this Court, challenging, among other things, the constitutionality of the games under Article II, Section 17 of the Delaware Constitution. After a full trial on the merits, Judge Walter K. Stapleton issued an opinion in which he concluded that the 1976 Games satisfied the legal standard for a lottery because chance was the dominant or controlling factor in the games. In so doing, the District Court noted:

> In Scoreboard, the unknowable factors in each game are multiplied by the number of games on which the Scoreboard player bets. None of the games permits head-to-head or single game betting. Thus, the element of chance that enters each game is multiplied by a minimum of three and a maximum of fourteen games.

*Nat'l Football League v. Governor of the State of Del.*, 435 F. Supp. 1372, 1385 (D. Del. 1977). Based on the statistical evidence presented, the Court concluded that "[t]he evidence tends to show that for the first nine weeks of the 1976 season chance was the dominant factor in the outcome of both the NFL games and the Delaware Football Lottery." *Id.*

24. In 1978, the Delaware General Assembly attempted to use the Lottery Exception to justify legislation permitting pari-mutuel or pool betting on jai alai exhibitions. Upon request from then-Governor Pierre S. du Pont, the Justices of the Delaware Supreme Court issued an opinion that the jai alai legislation was contrary to Article II, Section 17 of the Delaware Constitution. Noting that the Lottery Exception must be construed narrowly, the Justices found that pool or pari-mutuel wagering did not constitute a permissible lottery under the Lottery Exception. *Op. of the Justices*, 385 A.2d 695, 705 (Del. 1978).

### Congress Enacts Federal Legislation Outlawing Sports Gambling

25. PASPA became effective January 1, 1993. The statute prohibits any person or governmental entity from sponsoring, operating, advertising or promoting:

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702. PASPA allows four narrow exceptions, including one permitting states to operate sports-based gambling schemes to the extent that they conducted such schemes between 1976 and 1990. Pursuant to this exception, PASPA's general prohibition against sports betting shall not apply to:

> A lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, **to the extent that the scheme was conducted** by that State or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990.

28 U.S.C. § 3704(a)(1) (emphasis added).

26. Under the plain language of PASPA, a state like Delaware may only reintroduce a sports betting lottery or scheme if such sports betting lottery or scheme was "conducted" by the state between 1976 and 1990. 28 U.S.C. § 3704(a)(1).

27. In recognition of the fact that illegal sports gambling would irreparably harm sports leagues and organizations like MLB, the NBA, the NCAA, the NFL, and the NHL, PASPA explicitly gives those professional and amateur sports organizations standing to seek an injunction for any violation of its provisions. 28 U.S.C. § 3703.

**Governor Markell Resurrects Sports Betting in Delaware and
Requests an Advisory Opinion from the Justices Regarding Its Constitutionality**

28. On March 19, 2009, Governor Markell proposed sweeping legislation authorizing sports betting and table gaming at existing and future facilities throughout Delaware. On the same day, the Governor sent a letter to the five Justices of the Delaware Supreme Court requesting that the Justices render an opinion on the constitutionality (under the Delaware Constitution) of the sports lottery he proposed in his budget address earlier in the day. At the time Governor Markell sent his letter, no legislation had been introduced to the Delaware General Assembly for its consideration.

29. The Governor's letter outlined the general contours, but very few specifics, of his proposal, namely that (i) the proposed sports lottery would be under the State's control; (ii) the sports lottery would be operated for the purpose of raising funds for the State; (iii) the games offered by the Lottery Office would meet the definition of "lottery," as that term is interpreted in Article II, Section 17 of the Delaware Constitution, and (iv) no game would offer payouts based on pool or pari-mutuel wagering.

30. Governor Markell also described, in general terms, three types of games that he envisioned would be implemented as part of Delaware's sports lottery. These games

consisted of: (i) a "Single Game Lottery," in which players would have to select the winning team in any given sports contest with a line, such as a "point spread"; (ii) a "Total Lottery," in which players would have to select whether the total points scored by both teams in any particular sports contest would be over or under some specified number (an "over/under" bet); and (iii) a "Parlay Lottery," in which players would be asked to correctly choose the outcomes on multiple elements, such as the winners of two or more sports contests, two or more over/under bets, or some combination of winners and over/under bets.

31. On March 31, 2009, the Governor wrote again to the Justices, informing them of proposed legislation that had been introduced in the Delaware House of Representatives (the "House") on March 26, 2009 ("House Bill 100") which, if enacted, would authorize Director Lemons to "commence a sports lottery as soon as practicable."

32. In response, Chief Justice Myron T. Steele ("Chief Justice Steele") appointed counsel for both the affirmative and negative positions and, by letter dated April 7, 2009, requested that each side submit briefs addressing the issue posed by Governor Markell in his March 19 letter and several "subsidiary" issues.

33. Briefing on these issues was completed on May 8, 2009.[2] The NFL submitted an *amicus curiae* brief in support of the Negative Position, setting forth its views on why the proposed legislation violated the Delaware Constitution. In its brief, the NFL argued that (i) the lack of specificity surrounding the proposed sports lottery precluded the Justices from determining whether the lottery was dominated by chance, and thereby assessing its constitutionality, (ii) sports betting in general was an activity in which chance does not

---

[2] On May 19, 2009, both the Affirmative Position and the Negative Position submitted supplemental briefs to the Delaware Supreme Court to address the recent enactment of the Sports Lottery Law.

predominate, and it was therefore not a permissible activity under the Lottery Exception; and (iii) Governor Markell's request that the Justices weigh in on the design of Delaware's sports lottery constituted an impermissible usurpation of the General Assembly's powers.

34. House Bill 100 failed to garner the necessary votes in the House, and on May 5, 2009, the House rejected the proposed legislation. On May 8 and May 12, 2009, a modified version of House Bill 100 (House Substitute 1 to House Bill 100) passed both the Delaware House and Senate, respectively.

35. Section 4825 of the Sports Lottery Act empowers Director Lemons to "commence a sports lottery as soon as practicable" and to promulgate rules and regulations "providing for the features and attributes of a sports lottery" in a manner "which will produce the greatest income for the State while minimizing or eliminating the risk of financial loss to the State." 29 *Del. C.* § 4825(a).

36. The legislation dramatically expanded Governor Markell's initial proposal by including a provision authorizing the commencement of table gaming, *i.e.*, blackjack, craps, roulette and poker (to name a few). Notwithstanding this significant change to the legislation, the issues posed to the Justices remained limited to those surrounding the constitutionality of the proposed sports lottery described in Governor Markell's March 19 letter.

37. On May 14, 2009 – one week before oral argument was to be held before the Delaware Supreme Court – Governor Markell signed the Sports Lottery Act into law.

38. Argument was held before the Delaware Supreme Court on May 21, 2009. On May 27, 2009, the Justices issued their opinion, in which they concluded that (i) the proposed sports lottery outlined in Governor Markell's March 19 letter will be under State control, for purposes of the Lottery Exception, and does not impermissibly delegate legislative power to the

Lottery Director, and (ii) the Delaware Constitution permits lotteries involving an element of skill, so long as "chance is the dominant or controlling factor." *Request of the Governor*, __ A.2d __, 2009 WL 1475736, at *4-5.

39. Relying on the 1977 *NFL* opinion, the Justices opined that in parlay betting – in which a bettor must correctly pick the outcome (or total score) of multiple contests – chance is the "dominant factor," and parlay bets are therefore permitted under the Delaware Constitution. In contrast, the Justices expressly declined to comment on the constitutionality of single-game betting. In declining to do so, the Justices recognized that single-game betting is significantly different from the parlay games that were included in Delaware's 1976 Scoreboard program, and was *not* the subject of Judge Stapleton's 1977 opinion. The Justices also noted that they lacked the benefit of "actual evidence concerning single game bets and the extent to which 'the line' introduces chance and causes it to predominate over skill or merely manages the money flow." *Id.*, at *8.

40. On June 30, 2009, Delaware published its proposed sports lottery regulations. Those regulations confirm that Delaware broadly and impermissibly construes the concept of a "sports lottery" to include any lottery "in which the winners are determined based on the outcome of any professional or collegiate sporting event, including racing, held within or without the State, but excluding collegiate sporting events that involve a Delaware college or university, and amateur or professional sporting events that involve a Delaware team."

### COUNT I
### (Violation of PASPA)

41. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 40 as though fully set forth herein.

42. Under PASPA, Delaware is prohibited from sponsoring, operating, advertising or promoting sports gambling, sports wagering, or a sports lottery. 28 U.S.C. § 3702. The only exceptions to PASPA's blanket ban on sports gambling were granted to permit states to conduct sports betting lotteries or other schemes "to the extent" they "conducted" such schemes when PASPA was enacted, or between 1976 and 1990. 28 U.S.C. § 3704.

43. The plain language of PASPA prohibits Delaware from adopting any sports betting scheme other than the scheme that was in operation in 1976. *See* 28 U.S.C. § 3704(a)(1). Delaware is therefore limited to reinstituting at most the three Scoreboard parlay games that were conducted in the fall of 1976. Notably, none of those games (i) permitted single-game betting, or (ii) permitted betting on any sport other than NFL games.

44. In violation of the narrow exception contained in Section 3704(a)(1) of PASPA, Delaware's Sports Betting Scheme would permit sports betting schemes beyond those that Delaware conducted as part of the 1976 Games, including wagering on *all* professional and amateur sports, not just on NFL games. Indeed, the Request for Proposal issued by the Lottery Office in late May 2009, which solicits bids for a "Sports Wagering System and Services," does not single out *any* particular sport, much less the NFL. Similarly, the Lottery Office's proposed regulations define a "sports lottery" to include any lottery in which the winners are determined based on the outcome of *any* professional or collegiate sporting event (other than those involving a Delaware college or university or a Delaware team). Delaware's attempt to expand its sports lottery in this manner is a violation of PASPA Section 3704(a)(1).

45. In addition, the games currently being contemplated by Delaware's Sports Betting Scheme (as outlined in Governor Markell's March 19 letter) are significantly different than the games offered in 1976 – Football Bonus, Touchdown and Touchdown II. As recognized

by the Justices of the Delaware Supreme Court in their recent May 27, 2009 Opinion, none of the three Scoreboard games involved single-game or head-to-head betting, but rather were parlays in which players were required to select the winning outcome on multiple elements – at least seven contests in Football Bonus, at least three contests (and correctly choosing among three possible point spreads for each contest) in Touchdown, and at least four contests in Touchdown II. In contrast, two of the three games Delaware has proposed as part of its Sports Betting Scheme ("Single Game Lottery" and "Total Lottery") involve head-to-head or single-game betting. PASPA does not permit Delaware to expand upon the scheme that was in operation in 1976 by instituting and commencing games that Delaware did not conduct at that time.

46. Moreover, none of the three Scoreboard games in effect in 1976 and 1977 was ever legally permissible. In Football Bonus and Touchdown, the prizes were awarded on a pari-mutuel basis, a practice which the Justices of the Delaware Supreme Court subsequently found to violate the Delaware Constitution. *See Op. of the Justices*, 385 A.2d at 705. The last game, Touchdown II, was struck down by Judge Stapleton in his 1977 opinion because it utilized a fixed payoff scheme that violated the revenue apportionment provisions of the Delaware Lottery Act. *NFL*, 435 F. Supp. at 1387-88.

47. Plaintiffs' reputation and goodwill will be irreparably damaged if the violations alleged herein are not preliminarily and permanently enjoined.

48. Therefore, pursuant to the explicit authority conferred by Section 3703 of PASPA, plaintiffs seek an Order enjoining Defendants from commencing, operating and maintaining a sports betting scheme that is different from the scheme that Delaware conducted in 1976.

## COUNT II
### (Violation of Article II, Section 17 of the Delaware Constitution)

49. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 48 as though fully set forth herein.

50. Article II, Section 17 of the Delaware Constitution bans all forms of gambling within the State of Delaware except for, *inter alia*, "lotteries under State control for the purpose of raising funds." Del. Const. art. II, § 17(a). Article II, Section 17 further provides that the Delaware General Assembly shall enforce the provisions of Section 17 "by appropriate legislation."

51. To constitute a permissible "lottery," a participant's ability to win must be based predominantly on chance. If a participant can utilize skill to materially increase his or her chances of winning, the game is not a "lottery" and therefore not permitted by the Delaware Constitution.

52. Delaware's Sports Betting Scheme does not constitute a "lottery" for purposes of Article II, Section 17 of the Delaware Constitution because chance is not the "dominant determining factor," particularly in head-to-head or single-game betting.

53. Sports gambling – particularly when it involves betting on the outcome of a single athletic contest – is an activity in which skill plays a significant role, as bettors gather and analyze information relating to the teams and sports on which they are betting and compare their own internal assessments with those generated by odds-makers.

54. Plaintiffs have been and will be damaged by the breaches of the Delaware Constitution alleged herein.

55. Absent injunctive relief, plaintiffs will suffer irreparable harm to their reputations and goodwill.

56. Therefore, plaintiffs seek an Order enjoining defendants from commencing, operating and maintaining any sports lottery in which winners are determined by the outcome of a single athletic contest.

WHEREFORE, plaintiffs respectfully seek an Order of this Court:

a. Declaring that the Sports Lottery Act violates PASPA insofar as Delaware's Sports Betting Scheme includes sports betting schemes that Delaware did not conduct during the period beginning January 1, 1976, and ending August 31, 1990;

b. Declaring that the Sports Lottery Act violates PASPA insofar as Delaware's Sports Betting Scheme includes games involving head-to-head or single-game betting, which were not part of the sports betting scheme Delaware conducted in 1976;

c. Declaring that the Sports Lottery Act violates PASPA insofar as Delaware's Sports Betting Scheme contemplates betting on sports other than NFL games, an activity that was not part of Delaware's sports betting scheme conducted in 1976;

d. Declaring that the Sports Lottery Act violates PASPA insofar as Delaware's Sports Betting Scheme includes games based solely on the total points scored by both teams in any particular sports contest, and thus cannot invoke the exception in 28 U.S.C. § 3704(a)(1);

e. Declaring that the Sports Lottery Act violates PASPA insofar as Delaware has never operated a lawful sports lottery scheme, and thus cannot invoke the exception in 28 U.S.C. § 3704(a)(1);

f. Declaring that the Sports Lottery Act violates Article II, Section 17 of the Delaware Constitution insofar as Delaware's Sports Betting Scheme – which includes head-to-

head and single-game betting – does not constitute a permissible "lottery" under the Lottery Exception;

    g. Preliminarily and permanently enjoining defendants, and all others acting on their authority, instruction, and behalf, or under the authority of their respective offices, from commencing, instituting, operating, and maintaining a sports lottery scheme in which winners are determined by the outcome of a single athletic contest or are determined through the results of any athletic contests other than NFL games;

    h. Awarding plaintiffs their costs and attorneys' fees; and

    i. Granting such other and further relief as may be appropriate.

            MORRIS, NICHOLS, ARSHT & TUNNELL LLP

            */s/ Kenneth J. Nachbar*

            Kenneth J. Nachbar (#2067)
            Megan Ward Cascio (#3785)
            Susan W. Waesco (#4476)
            Pauletta J. Brown (#5139)
            1201 N. Market Street
            P.O. Box 1347
            Wilmington, DE 19899-1347
            (302) 658-9200
            knachbar@mnat.com
             *Attorneys for Plaintiffs The Office of the*
             *Commissioner of Baseball, The National*
             *Basketball Association, The National Collegiate*
             *Athletic Association, The National Football*
             *League and The National Hockey League*

July 24, 2009

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, THE NATIONAL BASKETBALL ASSOCIATION, a joint venture, THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, THE NATIONAL FOOTBALL LEAGUE, an unincorporated association, and THE NATIONAL HOCKEY LEAGUE, an unincorporated association,<br><br>    Plaintiffs,<br><br>  v.<br><br>JACK A. MARKELL, Governor of the State of Delaware, and WAYNE LEMONS, Director of the Delaware State Lottery Office,<br><br>    Defendants. | C.A. No. |

## VERIFICATION

STATE OF NEW YORK    )
             ) SS:
COUNTY OF NEW YORK   )

  Lawrence P. Ferazani, Jr. being duly sworn according to law hereby deposes and says that he is an authorized agent of The National Football League, that he has read the foregoing Verified Complaint, and that all statements contained therein are true and correct to the best of his personal knowledge, information and/or belief.

                          _____
                          Lawrence P. Ferazani, Jr.

SWORN TO AND SUBSCRIBED
before me this 24 day of July, 2009.

_____
Notary Public

GERALDINE A. D'ANGELO
Notary Public, State of New York
No. 30-4715958
Qualified in Nassau County
Commission Expires 12/31/10