IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE OFFICE OF THE COMMISSIONER OF )
BASEBALL, an unincorporated association )
doing business as Major League Baseball, THE )
NATIONAL BASKETBALL ASSOCIATION, )
a joint venture, THE NATIONAL )     C.A. No. 09-538-UNA
COLLEGIATE ATHLETIC ASSOCIATION, )
an unincorporated association, THE )
NATIONAL FOOTBALL LEAGUE, an )
unincorporated association, and THE )
NATIONAL HOCKEY LEAGUE, an )
unincorporated association, )
                               )
             Plaintiffs, )
                               )
     v. )
                               )
JACK A. MARKELL, Governor of the State of )
Delaware, and WAYNE LEMONS, Director of )
the Delaware State Lottery Office, )
                               )
            Defendants. )

**PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Kenneth J. Nachbar (#2067)
Megan Ward Cascio (#3785)
Susan W. Waesco (#4476)
Pauletta J. Brown (#5139)
1201 N. Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@mnat.com
   *Attorneys for Plaintiffs The Office of the
   Commissioner of Baseball, The National
   Basketball Association, The National Collegiate
   Athletic Association, The National Football
   League and The National Hockey League*

July 28, 2009

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................................II

INTRODUCTION ............................................................................................................1

STATEMENT OF FACTS .....................................................................................................3

    A.    The Parties. .........................................................................................................3

    B.    Delaware's Sports Betting in the 1970s......................................................5

    C.    Congress Enacts Federal Legislation Prohibiting the Spread of Sports Gambling. ......................................................................6

    D.    Delaware Proposes to Stretch the PASPA Exception to Conduct Single-Game Sports Betting and Expand Sports Betting to Encompass All Sports, Neither of Which Was Conducted in 1976. ...............................................................7

ARGUMENT ..............................................................................................................11

  I.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION PRESERVING THE STATUS QUO AND PREVENTING DEFENDANTS FROM CONDUCTING A "SPORTS LOTTERY" BASED UPON EITHER (i) SINGLE GAMES OR (ii) SPORTING EVENTS OTHER THAN PROFESSIONAL FOOTBALL GAMES. ............................................................11

    A.    The Purpose of a Preliminary Injunction Is to Preserve the Status Quo. ...................................................................11

    B.    The Standards for a Preliminary Injunction..............................................12

    C.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims. .......................................................................12

    D.    Plaintiffs Will Suffer Irreparable Harm if Delaware's Sports Betting Scheme Is Not Enjoined..................................17

    E.    The Balance of Hardships Tips Decidedly in Plaintiffs' Favor. ...................................................................21

    F.    An Injunction Will Serve the Public Interest.............................................24

CONCLUSION.............................................................................................................26

TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alaka v. Attorney Gen. of the U.S.,*
  456 F.3d 88 (3d Cir. 2006).................................................................................16

*Allegheny Energy, Inc. v. DQE, Inc.,*
  171 F.3d 153 (3d Cir. 1999)..............................................................................12

*Barnes v. Cohen,*
  749 F.2d 1009 (3d Cir. 1984)............................................................................14

*BFP v. Resolution Trust Corp.,*
  511 U.S. 531 (1994)...........................................................................................16

*BP Chem. Ltd. v. Formosa Chem. & Fibre Corp.,*
  229 F.3d 254 (3d Cir. 2000)..............................................................................21

*Camacho v. Tex. Workforce Comm'n,*
  326 F. Supp. 2d 794 (W.D. Tex. 2004).........................................................24-25

*Davenport v. Int'l Bhd. of Teamsters,*
  166 F.3d 356 (D.C. Cir. 1999)...........................................................................12

*Davis v. Pension Ben. Guar. Corp.,*
  -- F.3d --, 2009 WL 1979251 (D.C. Cir. July 10, 2009).....................................12

*E.E.O.C. v. Astra U.S.A., Inc.,*
  94 F.3d 738 (1st Cir. 1996)................................................................................12

*Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.,*
  847 F.2d 100 (3d Cir. 1989)..............................................................................17

*HRP Creative Servs. Co., LLC v. FPI-MV Entm't, LLC,*
  616 F. Supp. 2d 481 (D. Del. 2009)..................................................................17

*In re: Request of the Governor for an Advisory Op.,*
  -- A.2d --, 2009 WL 1475736 (Del. May 29, 2009) ........................................9-10

*Kaufman v. Allstate N.J. Ins. Co.,*
  561 F.3d 144 (3d Cir. 2009)..............................................................................14

*Kos Pharms. Inc. v. Andrx Corp.,*
  369 F.3d 700 (3d Cir. 2004)..........................................................................11-12

*McCahon v. Pa. Turnpike Comm'n,*
    491 F. Supp. 2d 522 (M.D. Pa. 2007)....................................................................24

*Nat'l Football League v. Governor of the State of Del.,*
    435 F. Supp. 1372 (D. Del. 1977)..........................................................5-6, 15, 20

*NLRB v. Electro-Voice, Inc.,*
    83 F.3d 1559 (7th Cir. 1996) ...............................................................................21

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.,*
    290 F.3d 578 (3d Cir. 2002)...........................................................................21, 24

*Opticians Ass'n of Am. v. Indep. Opticians of Am.,*
    920 F.2d 187 (3d Cir. 1990).........................................................................11, 21

*Ortho Pharm. Corp. v. Amgen, Inc.,*
    882 F.2d 806 (3d Cir. 1989)..................................................................................11

*Sikes v. Teleline, Inc.,*
    281 F.3d 1350 (11th Cir. 2002) ............................................................................15

*Solarex Corp. v. Advanced Photovoltaic Sys., Inc.,*
    1994 WL 803275 (D. Del. May 12, 1994)...........................................................21

*Univ. of Tex. v. Camenisch,*
    451 U.S. 390 (1981)......................................................................................11, 22

*Winter v. Natural Res. Def. Council, Inc.,*
    129 S. Ct. 365 (2008)............................................................................................12

**STATUTES**

29 *Del. C.* § 4802 ........................................................................................................4

29 *Del. C.* § 4803(l) ..................................................................................................20

29 *Del. C.* § 4825(a)....................................................................................................9

29 *Del. C.* § 4827 ........................................................................................................9

28 U.S.C. § 3701 ...........................................................................................................1

28 U.S.C. § 3702.................................................................................................. Passim

28 U.S.C. § 3703.................................................................................................2, 4, 18

28 U.S.C. § 3704(a) .................................................................................. 7, 13-14, 16

28 U.S.C. § 3704(a)(1).......................................................................................... Passim

28 U.S.C. §3704(a)(2)............................................................................................16

**OTHER AUTHORITIES**

Charles Alan Wright *et al.*, *Federal Practice and Procedure* (2009) .....................................11, 24

Del. Const. art. II, § 17.......................................................................................5, 8

**RULES**

Fed. R. Civ. P. 65(a) ..........................................................................................11

INTRODUCTION

In 1992, the United States Congress enacted the Professional and Amateur Sports Protection Act, codified at 28 U.S.C. § 3701 *et seq.* ("PASPA"). PASPA made it unlawful for any governmental entity to sponsor or operate a lottery or other wagering scheme based upon the outcome of a professional or amateur sporting event. 28 U.S.C. § 3702. The legislation carved out a narrow exception for a lottery or other wagering scheme in operation in a state "***to the extent that the scheme was conducted by that State***" from January 1, 1976 to August 31, 1990. 28 U.S.C. § 3704(a)(1) (emphasis added).

In 1976, Delaware conducted a *limited* sports lottery that permitted *only* certain types of parlay bets involving National Football League games. Delaware did not "conduct" any sports lottery based on any sport other than professional football, nor did it "conduct" any sports lottery involving single-game betting. Delaware terminated its sports lottery in late 1976, and the State has never conducted any further sports lottery.

Delaware now proposes a new sports lottery far exceeding the limited exception granted to the State under PASPA. In proposed regulations that were published on June 30, 2009, Delaware has indicated that it intends to offer *all* forms of sports betting (other than collegiate sports contests involving Delaware colleges or universities, and amateur or professional sports contests involving Delaware teams), including single-game betting and betting on all sports (not just professional football).

Delaware's proposed "sports lottery," on its face, violates the express terms of PASPA, and does not fall within any of PASPA's exceptions, in that it would dramatically expand sports betting in the State far beyond what was conducted in 1976, prior to PASPA's enactment. Accordingly, Delaware's proposed "sports lottery" is unlawful.

- 1 -

PASPA was enacted expressly to shield professional and amateur sports organizations from the irreparable damage likely to be caused to these organizations by the further spread of sports betting. Recognizing the imminent harm presented by the spread of sports gambling, the law specifically confers standing on professional and amateur sports organizations (like plaintiffs) to seek injunctive relief to stop sports betting schemes that violate PASPA. 28 U.S.C. § 3703. To preserve the status quo, and to prevent immediate irreparable harm, plaintiffs hereby seek a preliminary injunction prohibiting defendants (and all others acting on their authority, instruction, and behalf, or under the authority of their respective offices) from implementing or operating any sports lottery that goes beyond the scope of the limited exception available to Delaware based on the State's operation of a sports lottery in 1976, which was limited to certain parlay bets on professional football games.[1]

---

[1]    In Count II of their verified complaint (the "Complaint"), plaintiffs have also asserted that Delaware's proposed sports lottery violates the Delaware Constitution. Plaintiffs' request for a preliminary injunction, however, is based solely on Count I of the Complaint, in which plaintiffs allege that the State's proposed sports betting scheme violates PASPA.

STATEMENT OF FACTS

Plaintiffs bring this action for preliminary and permanent injunctive relief preventing defendants from implementing or operating a sports lottery in violation of PASPA. To be clear, plaintiffs do not seek to enjoin Delaware's sports lottery to the extent that the sports lottery implemented is of the type "conducted" by Delaware in 1976. Specifically, plaintiffs do not seek to enjoin Delaware's sports lottery to the extent that it involves certain forms of parlay betting (*i.e.*, predicting the correct winner, with or without a point spread, of multiple contests) on professional football games.

However, Delaware's proposed sports lottery extends well beyond what was "conducted" by Delaware in 1976: it contemplates both betting on single contests (including betting on the outcome with a point spread, and betting on the total points scored), as well as betting on contests other than professional football games (collectively, "Delaware's Sports Betting Scheme"). Single-game betting and betting on sports other than professional football unquestionably were *not* "conducted" by Delaware in 1976, and are therefore not permitted by PASPA. Accordingly, plaintiffs seek to enjoin Delaware's proposed sports lottery to the extent that it includes forms of betting that Delaware did not conduct in 1976.

Plaintiffs do not believe that any of the material facts are disputed. The issue before the Court, therefore, requires what is essentially a legal determination.

A.    The Parties.

Plaintiff The Office of the Commissioner of Baseball doing business as Major League Baseball ("MLB") is an unincorporated association whose members are the thirty Major League Baseball Clubs. The Office of the Commissioner of Baseball, on behalf of its members, has responsibility for administrative and operational matters relating to MLB. Plaintiff the

National Basketball Association (the "NBA") is a joint venture of thirty member teams with its principal place of business in New York, New York. The NBA engages in the production and marketing of NBA basketball and operates a professional basketball league in the United States and Canada. Plaintiff the National Collegiate Athletic Association (the "NCAA") is an unincorporated association, composed of nearly 1,300 institutions, conferences, organizations and individuals. The NCAA organizes and governs the athletic programs of colleges and universities throughout the United States. Plaintiff the National Football League (the "NFL") is an unincorporated association controlled by its thirty-two constituent member clubs. Originally formed in 1920 as the American Professional Football Conference, the league has been operating under the NFL moniker since 1922, and is the largest professional football league in the United States. Plaintiff the National Hockey League (the "NHL") is an unincorporated association composed of its thirty member clubs. NHL teams are located in a diverse group of cities throughout the United States and Canada. Collectively, plaintiffs represent the four major professional sports leagues in the United States, as well as the preeminent governing body for collegiate sports in the United States. Plaintiffs have express standing to bring civil actions to enjoin violations of PASPA. 28 U.S.C. § 3703.

 Defendant Jack A. Markell is the current Governor of the State of Delaware. Defendant Wayne Lemons is the current Director of the Lottery Office, an agency created by 29 *Del. C.* § 4802, that operates as a division of the Delaware Department of Finance. The Director of the Lottery Office is appointed by the Delaware Secretary of Finance with the written approval of the Governor. Director Lemons has primary responsibility for administering Delaware's existing video lottery and traditional lottery. Under the Delaware Sports Lottery Act (described in Section D below), the Director of the Lottery Office is vested with broad authority

to craft, implement and commence a sports lottery within the State, and to promulgate rules and regulations relating to its establishment and operation.

B.    Delaware's Sports Betting in the 1970s.

In September 1976, Delaware introduced two weekly "lottery" games in which the winners were determined by the results of NFL football games. A third "lottery" game was introduced mid-season as a replacement for one of the original games (collectively, the "1976 Games"). No legislation was enacted to expand or modify the existing Delaware Lottery Act to authorize these games. Rather, the 1976 Games were based solely on the purported authority provided by an opinion letter issued by the Delaware Attorney General's Office on May 19, 1976 (Brown Aff. Ex. 1),[2] despite the requirement set forth in Article II, Section 17 of the Delaware Constitution relating to "[l]otteries and other gambling," which requires the Delaware General Assembly to "enforce this Section by appropriate legislation." Del. Const. art. II, § 17.

The 1976 Games all required bettors to make parlay bets that were based on the results of multiple NFL games, and were collectively known as "Scoreboard."[3] In the first game, called "Football Bonus," the fourteen NFL games then played each week were divided into two seven-game pools. *NFL*, 435 F. Supp. at 1376. Bettors were required to project the winners of each of the seven games in one or both of the pools, and were permitted to place bets ranging from $1.00 to $10.00. *Id.* To win the game, players were required to correctly predict the

---

[2]    Transmittal Affidavit of Pauletta J. Brown, Esq., in Support of Plaintiffs' Opening Brief in Support of Their Motion for Preliminary Injunction ("Brown Aff. Ex. __").

[3]    In 1976, a lawsuit challenged the 1976 Games, including whether they constituted a "lottery" under the Delaware Constitution. *Nat'l Football League v. Governor of the State of Del.*, 435 F. Supp. 1372 (D. Del. 1977) (the "1977 Decision"). Judge Walter K. Stapleton's 1977 Decision describes the 1976 Games:  the description herein is taken from the 1977 Decision.

winners in all seven games in a pool. *Id.* If a player correctly selected the winners in both pools, *i.e.*, all fourteen games, he or she was entitled to an "All Game Bonus." *Id.* Prizes were awarded on a pool or pari-mutuel basis, so that payments were calculated by paying the total amount bet, less the amount paid to the State, *pro rata*, to all winning betters. *Id.*

The second game was called "Touchdown." *Id.* For each given week, players were asked not only to choose the winners of multiple NFL games, but also to correctly select, for each game, one of three ranges of possible point spreads. *Id.* To win, players were required to correctly select the winning team and the winning point spread range in each of three, four or five contests. *Id.* Like "Football Bonus," awards were paid on a pari-mutuel basis. *Id.*

The third game, "Touchdown II," replaced "Touchdown" mid-season. *Id.* In "Touchdown II," players were asked to consider a published point spread for each of twelve games and select a team to "beat" the point spread, *i.e.*, perform better than the point spread. *Id.* To win "Touchdown II," players had to correctly choose the team that beat the published point spread in a minimum of four and a maximum of twelve NFL games. *Id.* "Touchdown II" offered a fixed payout based upon the number of games on which players correctly predicted the winner. *Id.*

C.    Congress Enacts Federal Legislation Prohibiting the Spread
      of Sports Gambling.

In 1992, the United States Congress enacted PASPA to stop the proliferation of State-sponsored sports gambling and to maintain the integrity of professional and amateur sports. As reflected in the report submitted by then-Senator Biden in support of the passage of PASPA, the statute was enacted to protect the integrity of all team sports:

> Sports gambling threatens to change the nature of sporting events
> from wholesome entertainment for all ages to devices for
> gambling. It undermines public confidence in the character of

> professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people.

Brown Aff. Ex. 2, at *5 (S. Rep. No. 102-248 (1991), *as reprinted in* 1992 U.S.C.C.A.N. 3553, 1991 WL 258663).

PASPA became law on January 1, 1993. The statute prohibits any person or governmental entity from sponsoring, operating, advertising or promoting:

> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702.

PASPA allows four narrow exceptions, including one permitting states to operate sports-based gambling schemes to the extent that they "conducted" such schemes between 1976 and 1990. Pursuant to this exception, PASPA's general prohibition against sports betting shall not apply to:

> A lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, **to the extent that the scheme was conducted** by that State or other governmental entity at any time during the period beginning January 1, 1976, and ending August 31, 1990.

28 U.S.C. § 3704(a) (emphasis added).

> D.    Delaware Proposes to Stretch the PASPA Exception to Conduct Single-Game Sports Betting and Expand Sports Betting to Encompass All Sports, Neither of Which Was Conducted in 1976.

On March 19, 2009, Governor Markell proposed sweeping legislation authorizing sports betting and table gaming at existing and future facilities throughout Delaware. That same

day, to implement his plan to (re)introduce sports betting in Delaware, Governor Markell sent a letter to the five Justices of the Delaware Supreme Court requesting that the Justices render an opinion on the constitutionality (under the Delaware Constitution) of the sports lottery he proposed in his budget address earlier in the day.  Brown Aff. Ex. 3 at 1.  At the time Governor Markell sent his letter, no legislation had been introduced to the Delaware General Assembly for its consideration.

The Governor's letter outlined the general contours of his proposal to commence sports betting in Delaware, but provided very few specifics.  As articulated in the letter, Governor Markell proposed that:  (i) the proposed sports lottery would be under the State's control; (ii) the sports lottery would be operated for the purpose of raising funds for the State; (iii) the games offered by the Lottery Office would meet the definition of "lottery," as that term is interpreted in Article II, Section 17 of the Delaware Constitution (the "Lottery Exception"); and (iv) no game would offer payouts based on pool or pari-mutuel wagering.  Brown Aff. Ex. 3 at 3.

Governor Markell also described, in general terms, three types of games that he envisioned would be implemented as part of Delaware's Sports Betting Scheme.  These games included:  (i) a "Single Game Lottery," in which players would be asked to select the winning team in any given sports contest with a line, such as a "point spread"; (ii) a "Total Lottery," in which players would have to select whether the total points scored by both teams in a single game would be over or under a specified number (an "over/under" bet); and (iii) a "Parlay Lottery," in which players would be asked to correctly choose the outcomes on multiple elements, such as the winners of two or more sports contests, two or more over/under bets, or some combination of winners and over/under bets.  Brown Aff. Ex. 3 at 3.

On May 5, 2009, the House rejected the proposed legislation. On May 8 and May 12, 2009, a modified version of the original bill passed both the Delaware House and Senate, respectively. On May 14, 2009, Governor Markell signed the Sports Lottery Act into law.

Section 4825 of the Sports Lottery Act empowers Director Lemons to "commence a sports lottery as soon as practicable" and to promulgate rules and regulations "providing for the features and attributes of a sports lottery" in a manner "which will produce the greatest income for the State while minimizing or eliminating the risk of financial loss to the State." 29 *Del. C.* § 4825(a).[4]

Argument on the constitutionality of Delaware's proposed sports betting scheme (under the Delaware Constitution) was held before the Delaware Supreme Court on May 21, 2009.[5] On May 27, 2009, the Justices issued their opinion, in which they concluded that (i) the proposed sports lottery outlined in Governor Markell's March 19 letter will be under State control, for purposes of the Lottery Exception, and does not impermissibly delegate legislative power to the Lottery Director, and (ii) the Delaware Constitution permits lotteries involving an element of skill, so long as "chance is the dominant or controlling factor." *In re: Request of the Governor for an Advisory Op.*, -- A.2d --, 2009 WL 1475736, at *4-5 (Del. May 29, 2009).

The Justices' opinion relied heavily on Judge Stapleton's 1977 Decision, and adopted his view that in parlay betting – wagering in which a bettor must correctly pick the outcome (or total score) of multiple contests – chance is the "dominant factor," and that parlay

---

[4]    As enacted, the Sports Lottery Act also authorized the commencement of table gaming, *i.e.*, blackjack, craps, roulette and poker (to name a few). 29 *Del. C.* § 4827.

[5]    The NFL submitted an *amicus curiae* brief in support of the Negative Position (arguing that the Sports Lottery Act violated the Delaware Constitution) and was permitted to participate in the oral argument before the Delaware Supreme Court.

bets on sporting events are therefore permitted under the Delaware Constitution.  *Id.* at *8. Notably, the Justices expressly declined to comment on the constitutionality of single-game betting, which they recognized as being significantly different from the parlay games that were addressed by Judge Stapleton's 1977 Decision.  *Id.*

On June 30, 2009, Delaware published its proposed sports lottery regulations. Brown Aff. Ex. 4.    Those regulations confirm that Delaware broadly and impermissibly construes the concept of a "sports lottery" to include any lottery "in which the winners are determined based on the outcome of ***any*** professional or collegiate sporting ***event***, including racing, held within or without the State, but excluding collegiate sporting events that involve a Delaware college or university, and amateur or professional sporting events that involve a Delaware team."  *Id.* § 2.0 (emphasis added).[6]    The regulations also confirm that Delaware intends to allow single-game betting in addition to parlay betting, as they define the term "maximum wager limit" to include "the maximum amount that can be wagered on a single sports lottery wager be it head-to-head or parlay . . . ."  *Id.*

Delaware has announced that it intends to have its Sports Betting Scheme – which includes single-game betting – operational for the start of the 2009-2010 NFL regular season, which begins on September 10, 2009.  Brown Aff. Ex. 5 at 2.  Defendants have also expressed their intent to expand sports betting to include, at a minimum, betting on NBA games.  Brown Aff. Ex. 6.

---

[6]     The significance of the State's decision *not* to permit betting on Delaware collegiate, amateur and professional teams is discussed further in Section I.D below. *See infra* p. 20.

ARGUMENT

I.    PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION PRESERVING THE STATUS QUO AND PREVENTING DEFENDANTS FROM CONDUCTING A "SPORTS LOTTERY" BASED UPON EITHER (i) SINGLE GAMES OR (ii) SPORTING EVENTS OTHER THAN PROFESSIONAL FOOTBALL GAMES.

A.    The Purpose of a Preliminary Injunction Is to Preserve the Status Quo.

As the Supreme Court has observed, "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *see also Kos Pharms. Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989). Here, the status quo would be fundamentally altered if defendants were permitted, prior to an adjudication on the merits, to implement new forms of sports betting never before conducted in the State of Delaware.

Delaware has not yet begun taking bets on sporting events, and plaintiffs here are merely asking the Court to evaluate the legality of Delaware's Sports Betting Scheme *before* any sports betting commences. *See* 11A Charles Alan Wright *et al.*, *Federal Practice and Procedure*, § 2947 (2009) ("Although the fundamental fairness of preventing irremediable harm to a party is an important factor on a preliminary injunction application, the most compelling reason in favor of entering a Rule 65(a) order is the need to prevent the judicial process from being rendered futile by defendant's action or refusal to act."). This is a classic case of a preliminary injunction being necessary and appropriate to preserve "the last, peaceable, noncontested status of the parties," *see Kos*, 369 F.3d at 708 (quoting *Opticians Ass'n of Am. v.*

- 11 -

*Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990)), while the issue of the lawfulness of Delaware's Sports Betting Scheme is being litigated.

      B.    <u>The Standards for a Preliminary Injunction.</u>

      The standard required for a court to issue a preliminary injunction is well-established: "A plaintiff seeking a preliminary injunction must establish that (i) he is likely to succeed on the merits, (ii) he is likely to suffer irreparable harm in the absence of preliminary relief, (iii) the balance of equities tips in his favor, and (iv) an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008); *Kos*, 369 F.3d at 708); *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir. 1999). In deciding whether to issue a preliminary injunction, federal courts evaluate the factors on a "sliding scale" and balance them against each other. *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999). For example, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Davis v. Pension Ben. Guar. Corp.*, -- F.3d --, 2009 WL 1979251, at *2 (D.C. Cir. July 10, 2009). *See also E.E.O.C. v. Astra U.S.A., Inc.*, 94 F.3d 738 (1st Cir. 1996) ("when the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief").

      C.    <u>Plaintiffs Are Likely to Succeed on the Merits of Their Claims.</u>

      As explained below, plaintiffs can unmistakably demonstrate a likelihood of success on the merits on their Motion for Preliminary Injunction (the "Motion"). Indeed, plaintiffs' overwhelming likelihood of success is ascertainable from application of the clear law to the undisputed facts.

PASPA was enacted to prevent the proliferation of sports betting. *See supra* pp. 6-7. In passing PASPA, Congress specifically identified the irreparable harm posed by sports betting to the integrity of sports. To ensure the integrity of professional and amateur games, PASPA prohibits any person or governmental entity from sponsoring, operating, advertising or promoting any lottery or other wagering scheme based on the outcome of one or more professional or amateur sporting events. 28 U.S.C. § 3702. There is no dispute that, but for PASPA's exceptions (described below), Delaware would be flatly prohibited from conducting *any* "sports lottery."

PASPA contains four narrow exceptions.[7] The *only* exception that arguably applies to the State of Delaware is the exception that appears in Section 3704(a)(1) of PASPA, which reads:

---

[7]  The exceptions state in their entirety:

(a) Section 3704 shall not apply to--
  (1) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity, to the extent that the scheme was conducted by that State or other governmental entity at any time during the period beginning on January 1, 1976, and ending August 31, 1990;
  (2) a lottery, sweepstakes, or other betting, gambling, or wagering scheme in operation in a State or other governmental entity where both--
    (A) such scheme was authorized by a statute as in effect on October 2, 1991; and
    (B) a scheme described in Section 3702 (other than one based on pari-mutuel animal racing or jai-alai games) actually was conducted in that State or other governmental entity at any time during the period beginning September 1, 1989, and ending October 2, 1991, pursuant to the law of that State or other governmental entity;
  (3) a betting, gambling or wagering scheme, other than a lottery described in paragraph (l), conducted exclusively in casinos located in a municipality, but only to the extent that--
    (A) such scheme or a similar scheme was authorized, not later than one year after the effective date of this chapter [effective Jan. 1, 1993], to be operated in that municipality; and
    (B) any commercial casino gaming scheme was in operation in such municipality throughout the 10-year period ending on such effective date pursuant to a comprehensive system of State regulation authorized by that State's constitution and applicable solely to such municipality; or

(Continued . . .)

- 13 -

Section 3704.  Applicability.

(a)  Section 3702 shall not apply to--

     (1)  A lottery, sweepstakes, or other betting, gambling or wagering scheme in operation in a State or other governmental entity, to the extent that the scheme was conducted by that State or other governmental entity at any time during the period beginning January 1, 1976 and ending August 31, 1990;

28 U.S.C. § 3704(a)(1).  Significantly, this exception applies only to lotteries or similar schemes to the extent that any such scheme was "*conducted*" by the State during the period between January 1, 1976 and August 31, 1990.

Where, as here, a statute is clear on its face, the Court's duty is to construe the statute to apply its plain meaning.  *Kaufman v. Allstate N.J. Ins. Co.*, 561 F.3d 144, 155 (3d Cir. 2009) ("In interpreting a statute, the court looks first to the statute's plain meaning and if the statutory language is clear and unambiguous, the inquiry comes to an end.") (citation omitted); *Barnes v. Cohen*, 749 F.2d 1009, 1013 (3d Cir. 1984) ("In interpreting a statute, the starting point is of course the language of the statute itself.  It is to be presumed that 'the legislative purpose is expressed by the ordinary meaning of the words used,' and if the statutory language is clear, it is not necessary to examine the legislative history.") (internal citations omitted).  The exception in Section 3704(a)(1) could not state any more clearly that the only forms of sports betting authorized in Delaware under PASPA are those that were conducted in 1976.

---

(. . . continued)
     (4) pari-mutuel animal racing or jai-alai games.

28 U.S.C. § 3704(a).

- 14 -

It is undisputed that the *only* wagering schemes actually "conducted" by Delaware in 1976 were the three "Scoreboard" games. It is also undisputed that each of the games actually conducted involved (i) betting *solely* on NFL games and (ii) *solely* parlay betting. It is also beyond dispute that single-game betting was *not* "conducted" by the State of Delaware in 1976, or indeed, at any time during the period of the PASPA exception (*i.e.*, 1976 to 1990). As Judge Stapleton noted, "[n]one of the games permits head-to-head or single game betting." *NFL*, 435 F. Supp. at 1385. Because single-game betting was not "conducted" by Delaware between 1976 and 1990, such betting is beyond the scope of the exception in Section 3704(a)(1) of PASPA and thus not permitted under the statute's plain language.

For similar reasons, Delaware may not authorize sports betting on professional or amateur sports other than NFL games. Delaware "conducted" its 1976 sports lottery based *only* on NFL games. *NFL*, 435 F. Supp. at 1376. To the extent that Delaware is seeking to expand its sports lottery to athletic contests involving leagues *other than* the NFL, the State is violating PASPA and should be enjoined.

Any attempt by defendants to construe PASPA's exception for previously "conducted" sports betting schemes to permit *all* possible forms of betting on *all* sports is fundamentally inconsistent with the plain language of the statute. According to the Merriam-Webster Dictionary, the relevant definition of "conducted" is "to direct or take part in the operation or management of."[8] Put simply, "conducting" an activity means actually engaging in it. *See Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1366 n.41 (11th Cir. 2002) ("[O]ne of the requirements for satisfying section 1955 [of RICO] is that the gambling business be 'a violation

---

[8]     Available at http://www/merriam-webster.com/dictionary/conducted.

of the law of the State or political subdivision in which it is *conducted*.' This means that to prove his RICO claim, the plaintiff would have to show that the defendant violated the law of a state in which the gambling *occurred*.") (citation omitted) (emphasis added).

Thus, the exception upon which defendants rely applies *only* to sports lotteries that were actually operated in 1976. It is clearly *not* sufficient that a particular lottery may have been contemplated, or even authorized. Indeed, Section 3704 draws a distinction between wagering schemes that were "authorized" and those that were "conducted" – the exception in Section 3704(a)(2) applies to a wagering scheme that was both (i) "*authorized* by a statute as in effect on October 2, 1991," and (ii) "actually was *conducted* during the period beginning September 1, 1989 and ending on October 2, 1991." 28 U.S.C. §3704(a)(2) (emphasis added). The Congress that drafted § 3704(a) of PASPA thus acknowledged the difference between lottery schemes that were merely "authorized" and those that were "conducted." The Court must assume that Congress deliberately structured the statute in this manner. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("It is generally presumed that Congress acts intentionally and purposefully when it includes particular language in one section of a statute but omits it in another."); *Alaka v. Attorney Gen. of the U.S.*, 456 F.3d 88, 97-98 (3d Cir. 2006) ("It is a fundamental canon of statutory construction that where sections of a statute do not include a specific term used elsewhere in the statute, the drafters did not wish such a requirement to apply."). Thus, the exception upon which Delaware relies – applicable to wagering schemes dating back to 1976 – applies only to schemes that were "conducted." 28 U.S.C. § 3704(a)(1).

It is also instructive to note that the exception to PASPA does not broadly empower a state that conducted a sports lottery between 1976 and 1990 to conduct sports lotteries without limitation in the future. Had that been Congress' intent, the exception would

have read "Section 3702 shall not apply to *states* that conducted a lottery or other wagering scheme" between 1976 and 1990. Instead, § 3704(a)(1) does not except states categorically; rather, it is carefully crafted to except only specified activities, namely, wagering schemes, and then only "to the extent that the scheme was conducted" by a state between 1976 and 1990.

For the foregoing reasons, plaintiffs have shown an overwhelming probability of success on the merits of their claims that Delaware's Sports Betting Scheme, which contemplates both single-game betting and betting on sports other than professional football, is not permitted by any of PASPA's exceptions, and therefore violates PASPA.

> D. **Plaintiffs Will Suffer Irreparable Harm if Delaware's Sports Betting Scheme Is Not Enjoined.**

Irreparable harm exists where, if an injunction is not granted, the moving party will suffer harm that cannot be compensated by monetary damages. *See, e.g., Frank's GMC Truck Center, Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1989); *HRP Creative Servs. Co., LLC v. FPI-MV Entm't, LLC*, 616 F. Supp. 2d 481, 489 (D. Del. 2009).

Here, there can be no dispute that plaintiffs will suffer harm if sports betting is permitted to occur in violation of PASPA. As specifically found by Congress in enacting PASPA:

> [PASPA] serves an important public purpose, to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime. . . .
>
> Sports gambling threatens to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling. It undermines public confidence in the character of professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people. . . .
>
> As Paul Tagliabue, [then] Commissioner of the National Football League, testified:

> Sports gambling threatens the character of our team sports. Our games embody our very finest traditions and values. They stand for clean, healthy competition. They stand for teamwork. And they stand for success through preparation and honest effort. With legalized sports gambling, our games instead will come to represent the fast buck, the quick fix, the desire to get something for nothing. The spread of legalized sports gambling would change forever and for the worse what our games stand for and the way they are perceived.
>
> Sports gambling threatens the integrity of, and public confidence in, amateur and professional sports. Widespread legalization of sports gambling would inevitably promote suspicion about controversial plays and lead fans to think 'the fix was in' whenever their team failed to beat the point-spread.

Brown Aff. Ex. 2, at *4-5. Plainly, the expansion of sports betting contemplated by Delaware's Sports Betting Scheme would engender the very harms identified by Congress in enacting PASPA.

These harms are of the type that cannot possibly be remedied by subsequent monetary damages, as plaintiffs cannot prove quantifiable harm if sports betting is permitted to spread. Moreover, Congress expressly recognized this in enacting PASPA – Section 3703 expressly empowers the Attorney General of the United States, or a professional or amateur sports organization whose competitive game is alleged to be the basis of a PASPA violation, to sue for injunctive relief. 28 U.S.C. § 3703.

The spread of sports gambling, including sports lotteries involving single-game betting, threatens the integrity of professional and amateur sports and are fundamentally at odds with the principle – essential to the success of MLB, the NBA, the NCAA, the NFL and the NHL – that the outcomes of professional and collegiate athletic contests must be perceived by the

public as being determined solely on the basis of honest athletic competition. *See* Declaration of Roger Goodell ("Goodell Decl.") ¶¶ 3-5.[9]

Professional and amateur sports are an integral part of American culture, particularly among the country's youth who often look up to professional athletes as role models and heroes. The implementation of a comprehensive sports betting scheme in Delaware would irreparably harm professional and amateur sports by fostering suspicion and skepticism that individual plays and final scores of games may have been influenced by factors other than honest athletic competition. Goodell Decl. ¶ 5. Moreover, Delaware's Sports Betting Scheme significantly increases the likelihood that fans will no longer be bound by loyalty to a particular team or player, but rather will turn their attention to profiting from betting on games. Goodell Decl. ¶ 6; Stern Decl. ¶¶ 4-6. As Congress recognized when it enacted PASPA, the proliferation of sports betting, including the introduction of individual game sports betting in Delaware, threatens to harm the reputation and goodwill of MLB, the NBA, the NCAA, the NFL and the NHL, and to adversely affect the way the public views professional and amateur sports.

Plaintiffs have consistently opposed the expansion of legalized sports gambling in other states and at the federal level. Goodell Decl. ¶ 8; Stern Decl. ¶ 10, 12. In addition to their efforts contributing to the passage of PASPA (Goodell Decl. ¶ 8(a); Stern Decl. ¶ 7), professional sports leagues have worked to expand an ultimately unsuccessful federal bill that would have made it illegal to bet on all college sports to cover professional sports as well. Goodell Decl. ¶ 8(b); Stern Decl. ¶ 12(b). Professional sports leagues have also publicly

---

[9]     The Goodell Declaration, along with the Declaration of David J. Stern ("Stern Decl.") cited below, are being filed contemporaneously with plaintiffs' Motion and Opening Brief.

opposed efforts to legalize sports betting in Delaware (Goodell Decl. ¶ 8(c); Stern Decl. ¶ 12(c)), and the NBA has also opposed efforts by the State of New Jersey to legalize sports betting. Stern Decl. ¶ 12(a). Recently, plaintiffs successfully worked with Congress to obtain the passage of the Unlawful Internet Gambling Enforcement Act ("UIGEA"), and opposed legislation that would have repealed key provisions of the UIGEA. Goodell Decl. ¶ 8(d)-(3); Stern Decl. ¶ 12(d)-(e). Finally, sports leagues have taken steps to ensure that their players, coaches, officials, and league and team personnel do not engage in sports betting. *See, e.g.*, Goodell Decl. ¶ 9; Stern Decl. ¶ 11.

Notably, Delaware itself has recognized that the spread of sports gambling can alter the very nature of athletic competition, as the Sports Lottery Act specifically prohibits betting on Delaware teams. *See* 29 *Del. C.* § 4803(l) (expressly excluding "collegiate sporting events that involve a Delaware college or university and amateur or professional sporting events that involve a Delaware team" from the definition of "sports lottery"); *see also* Brown Aff. Ex. 4 § 2.0 (defining "sports lottery" in the same manner). In light of this fact, it is difficult, if not impossible, for the State to credibly maintain that the harm caused by legalizing sports betting – particularly single-game betting – is not significant.

Moreover, the harm caused by single-game sports betting is significantly greater than the harm caused by parlay sports betting. Single-game betting is most susceptible to influence and thus fosters suspicion that a game has been "fixed," as only one game need be manipulated for a bet to be successful. In contrast, influencing the outcome of parlay games necessarily requires manipulation of several variables, typically across several contests. In his 1977 Decision, Judge Stapleton recognized as much, noting that in parlay games (like those

conducted in 1976), "the unknowable factors in each game are multiplied by the number of games on which the . . . player bets." *NFL*, 435 F. Supp. at 1385.

Absent an injunction, plaintiffs will suffer the very harm to their reputations, and to the character of the sporting events that they conduct or sponsor, which Congress sought to prevent by enacting PASPA – the precise harm that Delaware seeks to ensure will not befall its own collegiate, amateur and professional teams. The Third Circuit has recognized that losses of reputation and goodwill are grounds for finding irreparable injury, *see Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 197 (3d Cir. 1990), that cannot be remedied by subsequent monetary damages. *BP Chem. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 263 (3d Cir. 2000) ("Such injuries to reputation are difficult to calculate, and thus money damages are an inadequate remedy."). Accordingly, plaintiffs have demonstrated that they will suffer irreparable harm if a preliminary injunction is not granted.

E.    The Balance of Hardships Tips Decidedly in Plaintiffs' Favor.

"Before granting an injunction, a district court must balance the relative harm to the parties, *i.e.*, the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Put simply, the question is whether "the threatened injury to Plaintiff outweighs any threatened harm to Defendant . . . ." *Solarex Corp. v. Advanced Photovoltaic Sys., Inc.*, 1994 WL 803275, at *1 (D. Del. May 12, 1994). Here, the balancing of harms weighs in favor of granting a limited injunction of the type plaintiffs now request, particularly in light of the fact that plaintiffs have demonstrated a strong likelihood of success on the merits. *See Novartis*, 290 F.3d at 597 (noting with approval the observation made by other federal circuit courts that "'the more likely the

plaintiff is to win, the less heavily need the balance of harms weigh in his favor'") (quoting *NLRB v. Electro-Voice, Inc.*, 83 F.3d 1559, 1568 (7th Cir. 1996)).

As discussed above, *see supra* pp. 11-12, the injunction plaintiffs seek here will simply preserve the status quo and prevent defendants from implementing a new sports betting scheme never previously conducted in Delaware. *See Camenisch*, 451 U.S. at 395. Plaintiffs are not seeking to block *all* forms of sports betting in Delaware. Rather, they are pursuing a narrow injunction that would prevent the State from implementing, as part of its Sports Betting Scheme, sports betting in Delaware that goes beyond what was conducted by the State in 1976. This type of injunction will preserve the narrow exceptions authorized by Congress when it enacted PASPA and prevent the exceptions from swallowing the rule, which is what Delaware is seeking to do. At the same time, it will allow Delaware to proceed with multiple-NFL game parlay bets of the type the State previously conducted, as well as table games.

At the time PASPA was enacted, Congress had no difficulty identifying the series of harms that would result if state-sponsored sports betting were permitted to spread. The legislative history is replete with references to the real harm caused by the proliferation of sports gambling:

- "[PASPA] serves an important public purpose, to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime." Brown Aff. Ex. 2, at *4.

- "Sports gambling threatens to change the nature of sporting events from wholesome entertainment for all ages to devices for gambling. It undermines public confidence in the character of professional and amateur sports. Furthermore, State-sanctioned sports gambling will promote gambling among our Nation's young people." *Id.* at *5.

- "Sports gambling threatens the integrity of, and public confidence in, amateur and professional sports. Widespread legalization of sports gambling would inevitably promote suspicion about controversial plays

and lead fans to think 'the fix was in' whenever their team failed to beat the point-spread." *Id.*

- "Sports gambling is a national problem. The harms it inflicts are felt beyond the borders of those States that sanction it. The moral erosion it produces cannot be limited geographically." *Id.*

- "We must do everything we can to keep sports clean so that the fans, and especially young people, can continue to have complete confidence in the honesty of the players and the contests. Scandals in the sporting world are big news and can have a devastating effect on the outlook of our youth to whom sports figures are heroes and idols." *Id.* at *6.

- "[PASPA] represents a judgment that sports gambling whether sponsored or authorized by a State or other governmental entity is a problem of legitimate Federal concern for which a Federal solution is warranted." *Id.* at *6-7.

In contrast, the harms that could befall the State of Delaware should an injunction issue are minimal. While Governor Markell has asserted that the passage of the Sports Lottery Act was "critical" to remedying a projected $778 million shortfall in the State's budget for fiscal year 2010 (Brown Aff. Ex. 7 at 1), the State has failed to even quantify the estimated financial benefit to the State resulting from single-game sports betting or from betting on sports other than professional football. Moreover, as noted above, should the Court issue the preliminary injunction sought by plaintiffs, Delaware will still be permitted to offer a sports wager that is unavailable to its neighbors – the multi-game parlay bet on professional football. The State's ability to offer table games – which presumably will generate significant revenues for the State – will also be unaffected by an injunction.

Delaware's need to generate revenue should not come at the expense of professional and amateur sports. Indeed, in enacting PASPA, Congress expressly rejected any argument that a state's budgetary needs could outweigh the harm associated with the expansion of betting on professional and amateur sports:

> The answer to State budgetary problems should not be to increase the number of lottery players or sports bettors, regardless of the worthiness of the cause. The committee believes that the risk to the reputation of one of our Nation's most popular pastimes, professional and amateur sporting events, is not worth it.

Brown Aff. Ex. 2, at *7. *See also Camacho v. Tex. Workforce Comm'n*, 326 F. Supp. 2d 794, 802 (W.D. Tex. 2004) (finding that the balance of harms weighed in favor of enjoining the implementation of state rules that conflicted with the federal Medicaid statute because "a state's budget problems cannot serve as an excuse" for altering a federal statute) (citation omitted).

Delaware has been able to balance its budget for the past thirty years without having to rely on sports betting as a source of revenue. In sum, the balance of hardships weighs clearly in favor of plaintiffs and supports the issuance of an injunction.

F.    An Injunction Will Serve the Public Interest.

Enjoining defendants from violating PASPA will also serve the public interest. This factor requires a court to "look beyond the parties' respective interests and to gauge the injunction's potential effects on the community as a whole." *McCahon v. Pa. Turnpike Comm'n*, 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007). "A federal statute prohibiting the threatened acts that are the subject matter of the litigation has been considered a strong factor in favor of granting a preliminary injunction." 11A Wright *et al.*, *supra*, § 2948.4. Moreover, in a situation such as the one here, where plaintiffs have demonstrated a strong likelihood of success on the merits, the Third Circuit has noted that "the public interest leans even more toward granting the injunction." *Novartis*, 290 F.3d at 597.

As stated in the legislative history, Congress enacted PASPA because it served "an important public purpose, to stop the spread of State-sponsored sports gambling and to maintain the integrity of our national pastime." Brown Aff. Ex. 2, at *4. Having enacted

PASPA in recognition of this important public purpose, it is also in the public's best interest to enforce the law. "[T]he public interest always is served when public officials act within the bounds of the law and respect the rights of the citizens they serve." *Camacho*, 326 F. Supp. 2d at 802 (citations omitted) (finding that the public interest was served by enjoining new rules that interfered with public assistance benefits that Congress "clearly intended to fund."). Here, it is without question that the public interest is best served by granting plaintiffs' request for a preliminary injunction and forcing defendants to act within the bounds of federal law.

CONCLUSION

Delaware has proposed, and intends to implement prior to September 10, 2009, a sports betting scheme that clearly violates PASPA. Plaintiffs seek a narrow injunction that will only enjoin defendants from offering betting schemes that go beyond the scope of the limited exception in PASPA. Plaintiffs have shown an overwhelming likelihood of success on the merits of their claim, as well as irreparable harm, a balance of hardships tipping decidedly in their favor, and that an injunction will serve the public interest. Accordingly, this Court should issue a preliminary injunction enjoining defendants from commencing, instituting, operating and maintaining any sports lottery other than one with the specific attributes of the sports lottery conducted by Delaware in 1976.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Kenneth J. Nachbar (#2067)
Megan Ward Cascio (#3785)
Susan W. Waesco (#4476)
Pauletta J. Brown (#5139)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
knachbar@mnat.com
*Attorneys for Plaintiffs The Office of the Commissioner of Baseball, The National Basketball Association, The National Collegiate Athletic Association, The National Football League and The National Hockey League*

July 28, 2009