IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association doing business as Major League Baseball, THE NATIONAL BASKETBALL ASSOCIATION, a joint venture, THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, an unincorporated association, THE NATIONAL FOOTBALL LEAGUE, an unincorporated association, and THE NATIONAL HOCKEY LEAGUE, an unincorporated association, | ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
|  | ) ) |  |
| Plaintiffs, | ) ) | C.A. No. 09-538 |
| v. | ) ) ) |  |
| JACK A. MARKELL, Governor of the State of Delaware, and WAYNE LEMONS, Director of the Delaware State Lottery Office, | ) ) ) ) ) |  |
| Defendants. | ) ) |  |

**DECLARATION OF ROGER GOODELL IN SUPPORT OF
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

I, ROGER GOODELL, under penalty of perjury, declare as follows:

1.      I am the Commissioner of the National Football League (the "NFL"), a position I have held since September 2006. Prior to being named Commissioner of the NFL, I served as the NFL's Chief Operating Officer, and have spent nearly thirty years serving the NFL in a variety of capacities. I submit this Declaration in support of Plaintiffs' Motion for a Preliminary Injunction.

2.      I am over the age of eighteen (18), am competent to make this Declaration, and have personal knowledge of the facts set forth herein.

**Delaware's Contemplated Sports Betting**
**Scheme Threatens to Irreparably Harm the NFL**

3.     As Commissioner of the NFL, my most important responsibility is maintaining the integrity of professional football, and preserving public confidence in the NFL.

4.     The NFL is the most popular and widely-recognized professional football league in the United States.  The great popularity of NFL football, and the goodwill it has achieved with its fans and the public as a whole, is rooted in the integrity of the game itself.  NFL football stands for clean, healthy competition, and rewards hard work, dedication, and honest effort.  Maintaining these values and the highest integrity of the game of professional football is a critical aspect of preserving the NFL's goodwill. For these reasons, NFL owners and players have worked diligently since the league's inception nearly 90 years ago to protect the NFL's integrity and maintain the public's confidence in the league.

5.     The spread of sports betting, including the introduction of individual-game sports betting as proposed by the state of Delaware, threatens to damage irreparably the integrity of, and public confidence in, NFL Football.  An increase in state-promoted sports betting would wrongly and unfairly engender suspicion and cynicism toward every on-the-field NFL event that affects the betting line.  When gambling is freely permitted on sporting events, normal incidents of the game such as bad snaps, dropped passes, turnovers, penalty flags, and play calling inevitably will fuel speculation, distrust and accusations of point-shaving or game-fixing.  I am aware that in the past, betting scandals related to legal sports betting have occurred both in the United States and in foreign countries.

2

6.     The new sports gambling scheme that Delaware proposes would also greatly increase the likelihood that the allegiance of certain fans will be turned from teams, players and high-level athletic competition, toward an interest first and foremost in winning a bet.  The core entertainment value of fair and honest competition that is reflected in NFL games will be replaced by the bettor's interest, based not on team or player performance, but on the potential financial impact of each on-the-field event.

7.     State-sponsorship of sports gambling also trades unfairly on the property and goodwill of the NFL.  For example, casinos and other gambling institutions that permit betting on sports are often viewed unfavorably by a significant portion of the public.  The NFL, on the other hand, strives to preserve and promote an image of fairness, and has invested mightily in maintaining this image.  State-sponsorship of sports gambling threatens to confuse fans into believing that the NFL supports sports gambling, thereby allowing casino operators and other sports-betting operations to trade unfairly on the NFL's goodwill and image of fairness.

## The NFL Has Vigorously Opposed the
## Spread of Sports Gambling in the United States

8.     Because of the threat that sports gambling poses to the goodwill and integrity of NFL Football, and to the fundamental bond of loyalty and devotion between fans and teams that the league seeks to maintain, the NFL has repeatedly and consistently been a leading opponent of legalized sports gambling.  Among the NFL's efforts to oppose the spread of sports gambling are the following:

(a)     The NFL's testimony and other efforts helped lead to the passage of the Professional and Amateur Sports Protection Act of 1992, which is at issue

3

in this lawsuit.   Then-NFL Commissioner Paul Tagliabue personally testified before Congress about the irreparable harm that sports gambling would cause to the character of team sports.  Commissioner Tagliabue said:

> [S]ports gambling threatens the character of team sports. Our games embody our very finest traditions and values. They stand for healthy competition, teamwork, success through preparation and honest effort. With legalized sports gambling, our games instead would come to represent the fast buck, the quick fix, the desire to get something for nothing. The spread of legalized sports gambling would change forever—and for the worse—what our games stand for and the way they are perceived.

Attached as Exhibit A is a true and correct copy of Commissioner Tagliabue's testimony to Congress.

(b)    From 2000-2002 the NFL, along with other professional sports leagues sought to amend an ultimately unsuccessful federal bill that would have made it illegal to bet on college sports in all states, such that the proposed ban would cover professional sports as well.  Attached as Exhibit B is a true and correct copy of a July 5, 2000 letter from the NFL and other professional sports leagues to the Honorable Henry J. Hyde, Chairman of the House Judiciary Committee.  Attached as Exhibit C is a true and correct copy of a February 11, 2002 letter from the NFL and other professional sports leagues to members of the United States House of Representatives.

(c)    In 2002, the NFL, along with other professional sports leagues, opposed state-sponsored sports gambling in Delaware.  Attached as Exhibit D is a true and correct copy of the opposition statement of the NFL and other professional sports leagues to state-sponsored sports gambling in Delaware, dated December 18, 2002.

(d)     Recently, the efforts of the NFL and the other plaintiffs in this lawsuit resulted in the passage of federal legislation prohibiting Internet gambling and providing additional tools to combat sports gambling. Attached as Exhibit E is a true and correct copy of a February 1, 2006 letter from the NFL and the other plaintiffs in this lawsuit to the U.S. Congress, supporting passage of the Unlawful Internet Gambling Enforcement Act ("UIGEA").

(e)     In 2007, the NFL and the other plaintiffs in this lawsuit successfully opposed legislation that would have repealed key provisions of the UIGEA. Attached as Exhibit F is a true and correct copy of a May 31, 2007 letter from the NFL and the other plaintiffs in this lawsuit to Members of the House Financial Services Committee. Attached as Exhibit G is a true and correct copy of an October 2, 2007 letter from the NFL and the other plaintiffs in this lawsuit to Bernard A. Schmitt, Deputy Chief of Staff of the Joint Committee on Taxation, opposing a proposed bill seeking to repeal key provisions of the UIGEA.

9.     The NFL's long and consistent opposition to gambling on the outcomes of its games is reflected in numerous provisions of its governing documents. Such provisions include the following:

(a)     Article 8.13(C) of the Constitution and Bylaws of the NFL, which defines the disciplinary authority of the Commissioner, states that

> Whenever the Commissioner . . . determines that a person employed by or connected with the League or any member club thereof has bet money or any thing of value on the outcome or score of any game or games played in the League or has had knowledge of or has received an offer, directly or indirectly, to control, fix, or bet money or other consideration on the outcome or score of a professional football game and has failed to report the same in the manner hereinafter prescribed, then the Commissioner

shall have complete and unrestricted authority to enforce any or all of the following penalties: [suspension, lifetime ban, fine, cancellation of employment contracts, forced sale of ownership interest, or] . . . such other or additional punishment or discipline as the Commissioner may decide.

(b)    Article 9.1(C)(12) of the Constitution and Bylaws of the NFL defines as "conduct detrimental to the League and professional football" the "offering, agreeing, conspiring, or attempting to influence the outcome of any game or [to] be interested in any pool or wager of any game in which a member club participates."

(c)    Paragraph 15 of the standard form NFL Player Contract, which has been specifically approved by the labor union that represents NFL players in collective bargaining, provides that,

Player recognizes the detriment to the League and professional football that would result from impairment of public confidence in the honest and orderly conduct of NFL games or the integrity and good character of NFL players. Player therefore acknowledges his awareness that if he accepts a bribe or agrees to throw or fix an NFL game; fails to promptly report a bribe offer or an attempt to throw or fix an NFL game; bets on an NFL game; [or] knowingly associates with gamblers or gambling activity . . . [he is subject to fine, suspension, or termination of his contract]; and

(d)    Page 45 of the NFL League Policies for Players, which advises players that the subject of bribes and gambling are covered each summer in special training-camp discussions with players by members of the League's Security Department, that a notice is posted in every NFL locker room reminding the players of Paragraph 15 of the standard form NFL Player Contract, and that

the League has a longstanding policy against any advertising or promotional activities by players, clubs, coaches or other management personnel that can reasonably be perceived as constituting affiliation with or endorsement of gambling or gambling-related activities. All club employees, including coaches and players, are prohibited from being associated with such

6

activities through endorsements, commercials, ads, or public appearances. Violators will be subject to appropriate discipline.

Promotional appearances by players, coaches, or other personnel involving casinos, sports books, gambling cruises, or similar activities are ***not*** permitted.

(e)     The NFL's Policy Manual for Administrative/Business Operations contains a policy entitled, "NFL Owner Involvement in Gambling-Related Businesses." This policy restates the strict separation between ownership of controlling interests in NFL teams and ownership of casinos, because, "even though lawful and regulated by state authorities, [casinos may] conduct sports betting and, specifically, point spread betting on NFL games." The policy sets forth detailed prohibitions regarding NFL owner involvement in the ownership or management of casinos, internet gambling enterprises, and other gambling-related enterprises, such as "tout services." The Policy rests on the premise that,

no League interest will be served by even limited direct or indirect ownership of, or investment in, . . . casinos or other gambling-related businesses by NFL owners. Instead, such ownership would likely damage League interests in the long term by, among other things, blurring the line between the absolute need for integrity in the playing and presentation of NFL games and the risk created by a misplaced perception that gambling and participation in the NFL are compatible.

(f)     Attached as Exhibits H, I, J, K and L respectively, are true and correct copies of Article 8.13(C) of the Constitution and Bylaws of the NFL, Article 9.1(C)(12) of the Constitution and Bylaws of the NFL, Paragraph 15 of the standard form NFL Player Contract, Page 45 of the NFL League Policies for Players, and pages 49-54 of Volume I of the NFL Policy Manual (Administrative/Business Operations).

Executed in _New York_     _N Y_

July _28_ , 2009

_____
Roger Goodell

8